Filed 4/10/25  P. v. Philbrook CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Nevada)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C097875 |
| v. | (Super. Ct. No. F16000256C) |
| NATHAN ROBERT PHILBROOK, | |
| Defendant and Appellant. | |

In 2014, defendant Nathan Robert Philbrook and two other men, Finley Fultz and Daniel Devencenzi, drove from Reno to Nevada County to steal marijuana from a greenhouse.  Defendant and Devencenzi had stolen marijuana from the same location about two weeks earlier.  Defendant decided to do so again because the marijuana was unattended the first time.  But in case that had changed, defendant and Fultz went to the location armed with loaded AR-15 firearms.  They went at night and made their way to the greenhouse.  Isaac Zafft was apparently asleep inside the greenhouse when they arrived.  When defendant went inside to look around, Zafft stood up and came towards

1

him.  Defendant pointed his gun at Zafft and told him to get on the ground.  When Zafft ran out of the greenhouse, Fultz shot him to death.

Charged with first degree felony murder with a robbery-murder special-circumstance allegation, defendant pleaded guilty to voluntary manslaughter and attempted robbery in exchange for his testimony against Fultz.  In accordance with the plea agreement, the trial court sentenced defendant to 23 years in state prison.

Defendant now appeals from the denial of his Penal Code section 1172.6 petition to recall his manslaughter sentence, arguing the evidence is insufficient to support the trial court's finding that he acted with reckless indifference to human life.[1]  In a supplemental brief, defendant also argues that a new law, Assembly Bill No. 2483 (2023-2024 Reg. Sess.) (Assembly Bill 2483), effective January 1, 2025, applies retroactively to this case and required the trial court to accept an initial agreement between the parties that defendant was eligible for resentencing.  Disagreeing with each of defendant's contentions, we will affirm the trial court's order.

## BACKGROUND

At the hearing on defendant's section 1172.6 petition, the People relied on the trial transcript from Fultz's trial, including testimony from defendant and his wife, Amber Nelson.[2]  Defendant also testified at the section 1172.6 hearing.  We summarize the

---

[1] Undesignated statutory references are to the Penal Code.  Defendant's original petition was filed under former section 1170.95.  Effective June 30, 2022, that section was renumbered section 1172.6 without change to the text.  (Stats. 2022, ch. 58, § 10.)  We will refer to the current statute.

[2] Devencenzi did not testify at Fultz's trial, but rather testified during a conditional examination, which was played for Fultz's jury.  The record in this appeal does not contain the transcript of the conditional examination.  However, this court summarized that testimony in *People v. Fultz* (2021) 69 Cal.App.5th 395.  Although we do not rely on that summary, we note that it is generally consistent with the testimony of defendant and Nelson, upon which we do rely in reciting the relevant facts.  (See *id*. at pp. 408-410.)

background facts based on that testimony and the written factual basis for defendant's guilty plea.

In 2014, defendant lived in Reno with Nelson. He grew marijuana in the garage and also stole the product from other growers. Devencenzi and Fultz were friends of defendant.

Sometime in late June 2014, defendant and Devencenzi drove to a rural and wooded area off of Highway 20 in the Penn Valley area of Nevada County to steal marijuana. Defendant selected the location for such thefts by searching Google Earth for signs of a growing operation. They found the marijuana unattended in a greenhouse and stole about 75 pounds of the product.

About two weeks later, Fultz called defendant and said he needed money. Defendant responded that he might be able to help. What defendant had in mind was making a return trip to the same greenhouse to steal more marijuana, this time with Fultz and Devencenzi. The plan was for defendant and Fultz to drive to the location in Fultz's truck while Devencenzi followed them in his truck. Defendant explained that he and Fultz would be armed, so he needed Devencenzi to follow them in the event that law enforcement got behind them while they drove. Should that occur, Devencenzi would swerve to draw their attention away from Fultz's truck. According to defendant's testimony, the guns were to be used only if they were getting shot at, but he did not say that to Fultz.

The following evening, Fultz and Devencenzi met defendant at his house. They left for the target greenhouse in accordance with the plan. Fultz had an AR-15 rifle. Defendant had an AR-15 pistol and also brought night vision binoculars and an extra clip of ammunition. They arrived at their destination well after dark and parked down the road from the greenhouse. The three men walked along the side of the road, traversed a cattle gate, and made their way to the greenhouse using the woods as cover.

3

When they got to the greenhouse, defendant could see that the mature plants were gone. He went in anyway, using the night vision binoculars to assist his eyesight. As defendant described, all that remained were several pots with immature plants in them, "like they were starting over." Defendant exited the greenhouse and talked to Fultz outside. They decided that defendant should go back inside and take a closer look. When defendant did so, he heard a rustling noise off to one side of the greenhouse. Defendant turned towards the noise and was surprised to see a man getting to his feet. The man, Zafft, moved in defendant's direction. Defendant pointed his gun, which had a laser sight, at Zafft and told him to get on the ground. Instead, Zafft ran out of the greenhouse and towards Fultz's location outside. Defendant heard a single gunshot and saw a muzzle flash, followed by someone screaming, then "a few more shots" and more muzzle flashes, and then silence.

Defendant, Fultz, and Devencenzi ran back to the trucks and drove to defendant's house. They burned certain items of clothing and destroyed the gun Fultz used to kill Zafft. Fultz later said he fired a warning shot, the guy started screaming, and Fultz fired more shots to shut him up.

In July 2016, defendant, Fultz, and Devencenzi were each charged with first degree felony murder with a robbery-murder special-circumstance allegation. Defendant pleaded guilty to voluntary manslaughter and attempted robbery, with a prior strike conviction, in exchange for his testimony against Fultz. In accordance with the plea agreement, the trial court sentenced defendant to serve 23 years in state prison. Defendant did not appeal from the judgment. (*People v. Philbrook* (May 10, 2022, C088692) [nonpub. opn.] (*Philbrook*).)

In January 2019, defendant filed a section 1172.6 petition. The People had stipulated that defendant was not the actual killer, did not intend that anyone be killed, and did not act with reckless indifference to human life. The trial court nevertheless denied the petition without issuing an order to show cause or holding a hearing.

4

Defendant appealed and this court reversed. (*Philbrook, supra*, C088692.) This court rejected defendant's argument that the stipulation obviated the need for a hearing on his petition, but because the trial court had applied the wrong standards in denying defendant's petition, this court remanded the matter for the trial court to determine whether to accept the parties' stipulation and proceed to resentencing or to reject the stipulation and order a hearing to determine whether defendant is entitled to relief. (*Ibid*.)

On remand, defendant filed a new motion asking the trial court to enforce the stipulation and find that he is entitled to relief under section 1172.6. The People opposed the motion. The trial court declined to accept the stipulation, held a hearing, and denied defendant's section 1172.6 petition.

DISCUSSION

I

Defendant contends the evidence is insufficient to support the trial court's finding that he acted with reckless indifference to human life under the factors set forth by the California Supreme Court in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*).

A

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) Section 189 describes a number of unlawful killings that are statutorily defined as "murder of the first degree," including a killing "committed in the perpetration of, or attempt to perpetrate, [certain listed felonies, including] robbery." (§ 189, subd. (a).) This form of first degree murder, known as first degree felony murder, does not require malice. Prior to Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437), " 'the only criminal intent required [was] the specific intent to commit the particular felony.' " (*People v. Dillon* (1983) 34 Cal.3d 441, 475.)

Effective January 1, 2019, Senate Bill 1437 amended the felony-murder rule to provide, in relevant part: "A participant in the perpetration or attempted perpetration of a

5

felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life . . . ." (§ 189, subd. (e).) The bill also created a procedure for those convicted of a qualifying offense to seek vacatur of their conviction and resentencing on any remaining counts. (See § 1172.6.) Senate Bill No. 775 (2020-2021 Reg. Sess.) makes clear that persons convicted of voluntary manslaughter can also seek resentencing relief under that procedure. (Stats. 2021, ch. 551, § 2.)

Here, defendant was charged with murder based on a felony-murder theory and pleaded guilty to voluntary manslaughter and attempted robbery. He was not the actual killer. The evidence conclusively establishes that Fultz fired the fatal shots. And there is no evidence that defendant intended for Fultz to kill Zafft. Thus, in order to affirm the trial court's order denying defendant's resentencing petition, there must be substantial evidence that he was a major participant in the attempted robbery and that he acted with reckless indifference to human life. Defendant challenges the sufficiency of the evidence regarding the reckless indifference element.[3]

---

[3] In his reply brief, defendant asserts the evidence is also insufficient to support a finding that he was a major participant in a listed felony, specifically attempted robbery. The argument is forfeited because it is raised for the first time in his reply brief without a showing of good cause. (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 482, fn. 10; *Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764-765.) In any event, defendant conceded in his opening brief that he was "a major participant in the underlying felony." The fact that Zafft ran outside where he was shot to death by Fultz does not mean that defendant did not attempt to rob him. Indeed, defendant pleaded guilty to that very crime. Defendant makes a number of additional arguments regarding the meaning of the

B

The major participation and reckless indifference requirements contained in section 190.2, subdivision (d), and incorporated into the felony-murder rule by Senate Bill 1437, "codify the holding of *Tison v. Arizona* (1987) 481 U.S. 137, which articulates the constitutional limits on executing felony murderers who did not personally kill. *Tison* and a prior decision on which it is based, *Enmund v. Florida* (1982) 458 U.S. 782, collectively place conduct on a spectrum, with felony-murder participants eligible for death only when their involvement is substantial and they demonstrate a reckless indifference to the grave risk of death created by their actions." (*Banks, supra*, 61 Cal.4th at p. 794.)

At one end of the spectrum is a defendant like Enmund, who planned and participated, as the getaway driver, in an armed robbery that resulted in the unplanned murder of the robbery victim and his wife. The *Enmund* court "found a broad consensus against imposing death in cases 'where the defendant did not commit the homicide, was not present when the killing took place, and did not participate in a plot or scheme to murder.' [Citation.]" (*Banks, supra*, 61 Cal.4th at p. 799.) At the other end of the spectrum are "actual killers and those who attempted or intended to kill." (*Id*. at p. 800.) In between these extremes, but falling on the permissible side of the constitutional line, are defendants like the Tison brothers, who "helped plan and carry out the escape of two convicted murderers from prison," including their father, who "was serving a life sentence for killing a guard in the course of a previous escape." (*Id*. at p. 802.) The Tison brothers brought "a cache of weapons to prison, arm[ed] both murderers, and [held] at gunpoint guards and visitors alike." (*Ibid*.) During their subsequent escape, they carjacked and kidnapped a family of four, took the family's possessions, and the

plea and whether the People have waived or are estopped to assert that defendant committed an attempted robbery. They are also raised for the first time in the reply brief and are similarly forfeited.

7

convicted murderers "then killed all four family members." (*Id*. at p. 799.) Although the Tison brothers did not kill or intend to kill, their " 'major participation in the felony committed, combined with reckless indifference to human life, [was] sufficient to satisfy the *Enmund* culpability requirement.' [Citation.]" (*Id*. at p. 800.)

Elaborating on reckless indifference in *Banks*, the California Supreme Court explained that an appellate court must "look to whether a defendant has ' "knowingly engag[ed] in criminal activities known to carry a grave risk of death." ' [Citations.] The defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create." (*Banks, supra*, 61 Cal.4th at p. 801.) In *Clark*, the court further explained that the major participation and reckless indifference elements are interrelated such that " 'the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life.' " (*Clark, supra*, 63 Cal.4th at p. 615, quoting *Tison v. Arizona, supra*, 481 U.S. at p. 153.) However, even significant participation does not necessarily entail possession of the requisite mental state. (*Clark,* at p. 617.) Instead, the reckless indifference defined in *Tison* "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Id*. at pp. 616-617.) " 'Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient' to establish reckless indifference to human life; 'only knowingly creating a "grave risk of death" ' satisfies the statutory requirement. [Citation.] Notably, 'the fact a participant [or planner of] an armed robbery could anticipate lethal force might be used' is not sufficient to establish reckless indifference to human life. [Citations.]" (*In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*).)

In determining whether defendant acted with reckless indifference, "[w]e analyze the totality of the circumstances" using the following relevant factors: "Did the defendant use or know that a gun would be used during the felony? How many weapons

8

were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony?" (*Scoggins, supra*, 9 Cal.5th at p. 677.)

Here, defendant personally armed himself with a loaded AR-15 pistol and used that pistol during the underlying felony to order Zafft to the ground. (See *People v. Owens* (2022) 78 Cal.App.5th 1015, 1024-1025 [the defendant's "own actions increased the degree of risk to human life when he pointed a gun at two victims"].) Defendant knew Fultz was armed with a loaded AR-15 rifle, defendant brought along an extra clip of ammunition, and defendant took an additional step to make sure that he and Fultz arrived at the greenhouse armed with those dangerous weapons (*People v. Bocanegra* (2023) 90 Cal.App.5th 1236, 1250), specifically by having Devencenzi follow them to the target location in order to distract any law enforcement that happened to be following behind them. Both firearms were ultimately used during the crime. Defendant used his to order Zafft to the ground, and when that act caused Zafft to run, Fultz used his to commit the murder. Defendant testified that he was at the greenhouse where the murder occurred. He was wearing night vision goggles and could see in the dark. Zafft ran from defendant, and then defendant saw a muzzle flash and heard a gunshot. Defendant heard someone screaming in pain for more than three seconds. Then defendant saw more muzzle flash and heard more gunshots, and the screaming stopped. As in *In re McDowell* (2020) 55 Cal.App.5th 999, the events unfolded quickly once Zafft began running away from defendant. But while Zafft was running, there is no evidence defendant attempted to yell a warning to Fultz. And in the moments following the initial gunshot, as defendant heard someone in pain, there is no evidence he attempted to yell any direction to Fultz or otherwise attempted to intervene before further shots were fired. There is no

evidence defendant took steps to prevent the murder, and he did not render any aid to Zafft, or at the very least check on his condition before fleeing the scene.

On the other hand, there is no evidence defendant knew Fultz was prone to violence or likely to use lethal force. And the perpetrators apparently hoped that the greenhouse would still be unoccupied at the time of the second theft. But because defendant and Devencenzi stole 75 pounds of marijuana from the same greenhouse two weeks earlier, it was entirely foreseeable that someone would be present at the greenhouse during the second raid. Defendant was aware of that possibility because the plan called for two loaded AR-15 firearms and additional ammunition. And although defendant later testified he had intended to use his AR-15 only in self-defense, there is no evidence he needed it for self-defense when he used it to order Zafft to the ground, and he did not tell Fultz, while planning the crime, that the weapons would only be for self-defense. Moreover, although the interaction with the victim was short, that was because defendant pointed his gun at Zafft, causing him to run. It was not a situation, as in *Clark*, where the duration of the interaction was short by design. (*Clark, supra*, 63 Cal.4th at p. 620.)

Even if a particular factor cuts in defendant's favor, it does not foreclose a finding that he acted with reckless indifference to human life. (*Clark, supra*, 63 Cal.4th at p. 622.) That is because no single factor is dispositive. The "totality of the circumstances" is what matters. (*Scoggins, supra*, 9 Cal.5th at p. 677.) Moreover, recklessness has an objective and subjective component. As the court explained in *Clark*, "although the presence of some degree of defendant's subjective awareness of taking a risk is required, it is the jury's objective determination that ultimately determines recklessness. Therefore, it would be possible for the defendant to have engaged in apparent efforts to minimize the risk of violence but still be determined by the jury to have been reckless, given all the circumstances known to defendant surrounding the crime." (*Clark,* at p. 622.) Stated simply, "a defendant's good faith but unreasonable

10

belief that he or she was not posing a risk to human life in pursuing the felony does not suffice to foreclose a determination of reckless indifference." (*Ibid.*) Here, any belief that the greenhouse would be unoccupied was unreasonable given the facts defendant knew at the time. And other aspects of the plan elevated the risk of death. The totality of the circumstances supports the trial court's conclusion that defendant exhibited reckless indifference to human life.

Defendant argues the trial court never mentioned the Supreme Court's standard for reckless indifference, i.e., "a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Clark, supra*, 63 Cal.4th at pp. 616-617.) However, before denying defendant's section 1172.6 petition and stating the reasons for its conclusion that defendant acted with reckless indifference to human life, the trial court said the applicable law was "well summarized by *People v. Nieber* (2022) 82 Cal.App.5th 458." That decision provides the following definition of reckless indifference, quoting *Scoggins, supra*, 9 Cal.5th 667: " 'Reckless indifference to human life has a subjective and an objective element. [Citation.] As to the subjective element, "[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed," and he or she must consciously disregard "the significant risk of death his or her actions create." [Citations.] As to the objective element, " '[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.' " [Citation.] "Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient" to establish reckless indifference to human life; "only knowingly creating a 'grave risk of death' " satisfies the statutory requirement.' [Citation.]" (*Nieber,* at pp. 477-478.) This is a comprehensive definition of reckless indifference. Absent evidence to the contrary, we must presume the trial court

11

understood and properly applied the law. (*People v. Thomas* (2011) 52 Cal.4th 336, 361.)

Defendant claims the trial court did not mention that the only evidence of defendant's intent involved stealing from an unoccupied greenhouse. However, defendant does not cite authority holding that a trial court must mention every factor the defendant believes is dispositive. On appeal, we review the trial court's ruling, not its reasoning. (See *People v. Zamudio* (2008) 43 Cal.4th 327, 351, fn. 11.) Unless a fact is dispositive, we must affirm. Even if defendant believed the greenhouse would be unoccupied, such an unreasonable belief did not foreclose a determination of reckless indifference. (*Clark, supra*, 63 Cal.4th at p. 622.)

Finally, defendant questions the factors upon which the trial court relied to support its conclusion that he exhibited reckless indifference. But again, we are not reviewing the trial court's reasoning. Based on the totality of the circumstances, the trial court's conclusion that defendant exhibited reckless indifference to human life is supported by substantial evidence.

## II

Defendant also claims that Assembly Bill 2483, effective January 1, 2025, applies retroactively to this case and required the trial court to accept the initial agreement between the parties that defendant was eligible for resentencing. With respect to retroactivity, the People do not argue otherwise. We therefore assume retroactivity. With respect to whether Assembly Bill 2483 alters the result in this case, the People argue the trial court retains the authority to reject the parties' initial agreement.

Section 1172.6, subdivision (d)(2) provides, in relevant part: "The parties may waive a resentencing hearing and stipulate that the petitioner is eligible to have the murder, attempted murder, or manslaughter conviction vacated and to be resentenced." In response to defendant's initial resentencing petition, the People stipulated that he was not the actual killer, did not intend that anyone be killed, and did not act with reckless

12

indifference to human life. The trial court rejected the stipulation and denied the petition. On appeal, this court rejected defendant's argument that the foregoing provision required the trial court to accept the stipulation. (*Philbrook, supra*, C088692.) Instead, this court interpreted the language authorizing the parties to stipulate to a defendant's eligibility for resentencing in a manner consistent with "long-standing law affording trial courts the authority to reject stipulations of the parties." (*Ibid*.)

Although defendant acknowledges that he is bound by our prior decision with respect to the meaning of section 1172.6, subdivision (d)(2), he argues that Assembly Bill 2483 "supersedes section 1172.6(d)(2) in this regard." Not so.

Assembly Bill 2483 enacted section 1171, the purpose of which was to promote greater uniformity in criminal postconviction resentencing procedures. (Stats. 2024, ch. 964, §§ 1, 2; Sen. Com. on Appropriations, Analysis of Assem. Bill No. 2483 (2023-2024 Reg. Sess.) Jul. 1, 2024, p. 2.) Section 1171 applies to all postconviction proceedings "to modify a sentence or conviction pursuant to an ameliorative statute," including sections 1170.18, 1172.1, 1172.6, 1172.7, and 1172.75. (§ 1171, subd. (a).) Subdivision (c) provides, in relevant part: "The following shall apply for all postconviction proceedings *unless there is a conflict with a more specific rule established in statute, in which case the more specific statute shall apply*: [¶] . . . [¶] (6) The parties may waive a hearing and proceed directly to the resentencing." (§ 1171, subd. (c)(6), italics added.)

" 'As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose.' [Citation.] 'We begin with the plain language of the statute, affording the words of the provision their ordinary and usual meaning and viewing them in their statutory context, because the language employed in the Legislature's enactment generally is the most reliable indicator of legislative intent.' [Citations.] The plain meaning controls if there is no ambiguity in the statutory language. [Citation.] If, however, 'the statutory language may reasonably

13

be given more than one interpretation, " ' "courts may consider various extrinsic aids, including the purpose of the statute, the evils to be remedied, the legislative history, public policy, and the statutory scheme encompassing the statute." ' " ' [Citation.]" (*People v. Cornett* (2012) 53 Cal.4th 1261, 1265.)

Defendant argues the plain meaning of section 1171, subdivision (c)(6) is clear. Unlike section 1172.6, subdivision (d)(2), it does not include the word "stipulate" and therefore, according to defendant, did not import the law authorizing trial courts to reject a stipulation. Additionally, it states that the parties may "proceed *directly* to the resentencing." (§ 1171, subd. (c)(6), italics added.) Defendant argues the word "directly" plainly means that "the trial court is not granted statutory authority to interpose its own stopping point between the parties' agreement and resentencing," i.e., by rejecting the parties' waiver of a hearing. Defendant argues the parties' initial agreement that defendant was eligible for resentencing "was plainly a waiver of a hearing as defined in section 1171, subdivision (c)(6)," and therefore, the trial court was required to "proceed directly to the resentencing" (§ 1171, subd. (c)(6)), without deciding for itself whether defendant was entitled to relief.

We need not decide whether defendant is right about the meaning of section 1171, subdivision (c)(6) because that provision does not apply if it conflicts "with a more specific rule established in statute, in which case the more specific statute shall apply." (§ 1171, subd. (c).) The language of section 1171, subdivision (c)(6) is more general than the language of section 1172.6, subdivision (d)(2). And if defendant's argument were to be adopted, it would establish a conflict between the two provisions. Under his reading of the new law, the trial court has no authority to reject an agreement between the parties that the defendant is entitled to be resentenced. If that were true, it would conflict with this court's interpretation of the more specific language of section 1172.6, subdivision (d)(2), that the trial court is not required to accept the agreement of the parties. (*Philbrook, supra*, C088692.) Because section 1171, subdivision (c) specifically

14

states that in the case of a conflict "the more specific statute shall apply," we apply section 1172.6, subdivision (d)(2), not section 1171, subdivision (c)(6).

Under section 1172.6, subdivision (d)(2), the trial court had the authority to reject the parties' initial agreement that defendant was eligible for resentencing.

DISPOSITION

The judgment is affirmed.

_____/S/_____
MAURO, J.

We concur:

_____/S/_____
EARL, P. J.

_____/S/_____
ROBIE, J.